**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FILED**

MAY 23 2013

Clerk, U.S. District and
Bankruptcy Courts

---------------------------------------------------------- :
                                                           :
**UNITED STATES OF AMERICA**                               :
                                                           :
          v.                                               :     **Docket Number CR-11-111 (RCL)**
                                                           :
**JULIAN ZAPATA ESPINOZA,**                                :
    also known as "Piolin,"                                :
                                                           :
          **Defendant.**                                   :
---------------------------------------------------------- :

*hut This by filed.*
*Roger C. Lamberth*
*U.S.D.J.  5/23/13*

## STIPULATED STATEMENT OF FACTS

The United States of America, through its attorney, the United States Attorney for the

District of Columbia, and the United States Department of Justice Criminal Division (hereinafter

referred to collectively as the "Government"), and Julian Zapata Espinoza (hereinafter referred to

as "the defendant") hereby submit this Stipulated Statement of Facts in support of a guilty plea.

### Elements of the Offenses

1.      The defendant is charged in Count One of a pending Indictment with the Murder

of an Officer or Employee of the United States, in violation of Title 18, United States Code,

Sections 1114, 1111, and 2.  The essential elements of this offense are:

a.      the defendant unlawfully committed the killing, that is, murder as defined by Title

18, United States Code, Section 1111, of Special Agent Jaime Zapata;

b.      at the time of the offense, Special Agent Jaime Zapata was an officer or employee

of the United States; and

c.      that the offense occurred while Special Agent Jaime Zapata was engaged in or on

account of the performance of his official duties.

2.    The defendant is charged in Count Two of a pending Indictment with the Attempted Murder of an Officer or Employee of the United States, in violation of Title 18, United States Code, Sections 1114, 1113, and 2. The essential elements of this offense are:

a.    the defendant unlawfully attempted to commit a killing, that is, murder as defined by Title 18, United States Code, Section 1111, of Special Agent Victor Avila, that is the defendant willfully took some action that was a substantial step in an effort to bring about or accomplish that crime;

b.    at the time of the offense, Special Agent Victor Avila was an officer or employee of the United States; and

c.    that the offense occurred while Special Agent Victor Avila was engaged in or on account of the performance of his official duties.

### Background

3.    The *Los Zetas* Cartel ("Zetas") began as an enforcement wing of the Gulf Cartel, and emerged in recent years as an independent Mexican Drug Trafficking Organization. Initially comprised of Mexican Special Forces deserters, it has evolved into a violent and sophisticated criminal transnational organization spanning from Central America to the United States. In Mexico, the Zetas control much of the organized criminal activity from the state of San Luis Potosi to the border town of Nuevo Laredo.

4.    The Zetas are heavily armed and they protect their territory from the Gulf Cartel and other perceived threats through the use of force. It recruits its members from Mexico as well as Central America. Its hierarchy mirrors the command structure of the military. Each town or city within its control has a boss, which is known as a plaza boss. The plaza boss reports to a regional

boss, who in turn reports to the Zetas leadership. The plaza boss employs the use of numerous hit squads, known as "*estacas*." An *estaca* consists of three to four armed hitmen or "*sicarios*" and is led by a commander or "*comandante*." The *estacas* patrol Zetas-controlled territory primarily by vehicle, providing protection for the cartel's illegal activity, identifying and eliminating rival cartel members, and engaging in other criminal activity to include carjackings and assassinations. The plaza boss also employs the use of numerous lookouts, known as "*halcones*," to monitor activity within the plaza territory.

5.      At all times relevant to the indictment, the defendant was a member of the Zetas, and he served in the Mexican state of San Luis Potosi as the commander of an *estaca*. As an *estaca* commander, the defendant had a leadership role within the Zetas organization, and he had direct control and responsibility for three *sicarios* who worked directly under his supervision. His primary area of geographic responsibility where he would carry out his general duties as an *estaca* commander was the city of San Luis Potosi, which is in the Mexican state of San Luis Potosi, and the surrounding area, including a stretch of highway no. 57 between the cities of San Luis Potosi and Santa Maria del Rio.

### Government's Evidence of the Offense

6.      On February 15, 2011, United States Department of Homeland Security Immigration and Customs Enforcement ("ICE") Special Agents Jaime Zapata and Victor Avila, while acting in their official capacity as officers of the United States and while engaged in their official duties, were traveling on Mexican highway no. 57 southbound returning to Mexico City in a blue Chevrolet Suburban armored government vehicle, bearing diplomatic license plates.

7.      Also on February 15, 2011, the defendant was on duty as an *estaca* commander

driving a late model Dodge Ram with his three *sicarios* along Mexican highway no. 57. The members of the defendant's *estaca* working for him that day consisted of Jesus Ivan Quezada Piña (also known as "Loco"), Ruben Dario Venegas Rivera (also known as "Catracho"), and another individual known as "Raton."

8.      Shortly after 2:00 p.m. that day, the defendant's *estaca* saw the agents' vehicle traveling on Mexican highway no. 57, and noticed that the vehicle was armored. At the time that the defendant spotted the agents' vehicle, Special Agent Jaime Zapata was operating the vehicle and Special Agent Victor Avila was seated in the front passenger seat. The defendant decided that he would stop the vehicle in order to steal it for use by the Zetas. The defendant also wanted to investigate whether the agents' vehicle contained rival cartel members that should be neutralized.

9.      To accomplish his goal of stopping and stealing the vehicle, and to assist in case the vehicle contained rival cartel members, the defendant called another Zetas *estaca* commander, known as "Zafado" (or "Safado"), to request his assistance with the operation to stop and steal the armored vehicle. Zafado, who was driving a late model GMC Yukon truck with his three *sicarios*, responded to the defendant's request for assistance and joined the defendant on Mexican highway no. 57 in order to stop and steal the agent's vehicle. The members of Zafado's *estaca* working for him that day consisted of Jose Ismael Nava Villagran (also known as "Cacho"), and two other individuals, known as "Camaron" and "Guacho."

10.     At approximately 2:15 p.m., the defendant, with the assistance of Zafado, forced the agents' vehicle off the road. Once the agents were forced off of the road, members of both *estacas*, including the defendant, exited their vehicles and surrounded the agents' vehicle. All of the estaca members were armed and displayed various firearms, including AK-47s, AR-15s and handguns. As

the leader of the operation, the defendant approached the driver's side door of the agents' vehicle and yelled at the agents ordering them to exit their vehicle. The defendant opened the driver's side door which was then closed immediately. Armed with a handgun, the defendant fired shots near the agents' vehicle when the agents did not comply with his order to get out of their vehicle. The defendant then started walking in front of the agents' vehicle towards the passenger side as Special Agent Avila attempted to explain in Spanish to the defendant and the others that they were American diplomats from the U.S. Embassy.

11.     At some point during the confrontation, the front passenger window was lowered. Taking advantage of this, two *sicarios* inserted their firearms – a long gun and a handgun – into the passenger compartment of the vehicle through the slightly open window and commenced firing into the vehicle at Special Agents Zapata and Avila. Both agents were struck by gunfire. Special Agent Avila was able to close the window and the agents attempted to drive away and escape the attack, striking at least one of the estaca vehicles that had surrounded them. All of the *estaca* members fired their guns at the agents' vehicle as they attempted to escape or at some point during the operation. Special Agents Zapata and Avila were able to drive across the road, however, their vehicle stalled in a median ditch. One of the *estaca* vehicles fled south as the Zetas in the second estaca vehicle approached the agent's stalled vehicle and opened fire again at the agents, striking their vehicle's windshield and exterior, before eventually fleeing southbound. Both *estacas* then took a u-turn and continued to flee northbound on highway no. 57 toward the city of San Luis Potosi.

12.     Shortly after the attack, Special Agents Zapata and Avila were transported to a hospital in the city of San Luis Potosi. Special Agent Zapata was mortally wounded and died as a result of the gunshot wounds he suffered during the attack. Special Agent Avila, who had been

5

seriously injured, was treated for the gunshot wounds he received during the attack. On February 16, 2011, Special Agent Avila was transported from Mexico to the United States where he received additional medical treatment for the injuries he sustained in the attack.

13.     On February 17, 2011, an autopsy was performed on Special Agent Zapata in the United States, by the Office of the Armed Forces Medical Examiner, and it was concluded that the manner of Agent Zapata's death was homicide and the cause of death was multiple gunshot wounds.

14.     On the afternoon of February 15, 2011, Mexican and U.S. law enforcement authorities responded to the scene of the attack and observed the agents' armored government vehicle sitting in the median ditch. The tires had been shot out and the vehicle had sustained multiple gunshots to its exterior, including the front, passenger side and rear of the vehicle. Several windows, including the windshield and front passenger side window, had damage consistent with gunfire. There also appeared to be a large amount of blood on the driver's seat.

15.     While at the crime scene, the Mexican authorities recovered ballistics evidence, including numerous cartridge casings. U.S. law enforcement authorities were subsequently permitted to inspect and examine the cartridge casings seized at the scene and concluded that: (1) fifteen of the cartridge casings were identified as .223 caliber, which are most commonly associated with AR-15 and M-16 assault rifles; (2) twenty-one of the cartridge casings were identified as 9 mm, which are most commonly associated with 9 mm pistols or submachine guns; and (3) fifty-two of the cartridge casings were identified as 7.62 x 39 mm, which are most commonly associated with AK-47 type firearms.

16.     On February 23, 2011, the defendant was arrested by the Mexican authorities at a residence in San Luis Potosi, along with Quezada Piña, Venegas Rivera, and Francisco Carbajal

6

Flores (also known as "Dalmata") and others.  The Mexican authorities seized the following six firearms at the time and location of his arrest: (1) a Bushmaster, Model XM15-E2S, .223 caliber rifle; (2) a DPMS, Model A15, .223 caliber rifle; (3) a ROMARM/CUGIR, Model WASR-10/63KR, 7.62 caliber rifle; (4) a ROMARM/CUGIR, Model Draco, 7.62 caliber rifle; (5) a Norinco, Model MAK90, 7.62 caliber rifle; and (6) a Smith & Wesson, Model 645, .45 caliber pistol.  Along with the weapons, the Mexican authorities seized 41 magazines of ammunition, twenty of which contained 7.62 x 39 mm caliber ammunition and twenty-one of which contained .223 caliber ammunition.  U.S. law enforcement officers were able to inspect and examine the firearms and ammunition that were seized during the defendant's arrest, and concluded that the six weapons were operable and that the ammunition was consistent with the cartridge casings that were located at the crime scene in caliber and by manufacturer.

17.     U.S. law enforcement also conducted a comparative examination of the recovered cartridge casings and firearms.  The examination  revealed that some of cartridge casings recovered from the crime scene were discharged from following three firearms, which were seized during the defendant's arrest: (1) the DPMS .223 caliber rifle; (2) the ROMARM/CUGIR, Model WASR, 7.62 caliber rifle; and (3) the ROMARM/CUGIR, Model Draco, 7.62 caliber rifle.

**Defendant's Statement**

18.     In April 2013, in the presence and with the assistance of his lawyer, Ron Earnest, Esquire, the defendant was interviewed by U.S. law enforcement officers after the defendant expressed an interest in voluntarily telling the United States representatives how he and others had attacked the ICE agents on February 15, 2011.  The interview was conducted in Spanish.  During the interview, the defendant acknowledged his involvement in the attack, and he specifically stated the

7

following:

a) The defendant stated that he had been employed by Los Zetas since the Summer of 2009. He advised that he started working as a Zetas *halcon*, but quickly began working as a *sicario*. His primary responsibility as a *sicario* was patrolling and protecting Zetas territory. This included looking for and eliminating rival cartel members, protecting drug houses, and committing various criminal acts on behalf of Los Zetas, including kidnappings and carjackings. In early 2011, the defendant and the other *estacas* operating in San Luis Potosi had a standing order from the Zetas leadership to steal vehicles deemed valuable to the cartel.

b) The defendant stated that on the day of the attack on the ICE agents, he was working as a *comandante* of an *estaca* operating in San Luis Potosi. He advised that his *estaca* consisted of three *sicarios* – Loco, Catracho and Raton. On the morning of the attack, he and his *estaca* detained three individuals in San Luis Potosi on suspicion of being rival cartel members. The defendant stated that he called for support and Zafado arrived with his *estaca*, which included Cacho, Camaron, and another *sicario*. The defendant stated that Zafado took custody of the three individuals, and that both *estacas* then departed the city of San Luis Potosi to deliver the individuals to a Zetas police liaison, identified as "Name."

c) The defendant advised that as he was traveling southbound on highway no. 57, Raton noticed an armored car pass his vehicle. After a brief discussion, the defendant decided to stop the armored vehicle. The defendant advised

that he contacted Zafado by radio and requested that Zafado and his *estaca* assist in stopping the armored vehicle. The defendant and Zafado's *estacas* then forced the armored vehicle to stop along side the highway.

d) The defendant stated that after boxing in the armored vehicle, all eight *estaca* members – which included the defendant, Loco, Catracho and Raton from the defendant's *estaca*, and Zafado, Cacho, Camaron and another *sicario* from Zafado's *estaca* – exited their vehicles, surrounded the armored vehicle, and brandished various firearms, including AK-47s, AR-15s, and handguns.

e) The defendant stated that as he approached the driver's side door of the armored vehicle, he was armed with a handgun and noticed that it was occupied by two adult males. The defendant advised that he ordered the occupants out of the vehicle, but they refused. The defendant stated that he pulled open the driver's side door, but it was quickly closed and then locked. The defendant acknowledged that as he walked toward the front of the armored vehicle, he brandished a handgun and fired it several times in the air in an attempt to convince the occupants of the vehicle to get out.

f) The defendant stated that he observed one of his *estaca* members with a long gun inserted into the passenger side window of the armored vehicle. The defendant advised that he observed this *estaca* member fire into the passenger compartment of the armored vehicle. He stated that all of the *sicarios* then began to fire at the armored vehicle.

g) The defendant stated that the armored vehicle attempt to drive off. It struck his vehicle and then came to rest a short distance away in the median. The

defendant and Zafado's *estacas* fled the scene, returning to the city of San Luis Potosi.

h)      The defendant stated that in the early morning hours of February 23, 2011, he was arrested at a residence in San Luis Potosi, along with his *estaca*, which, at this time, included Dalmata (who had replaced Raton), Loco and Catracho.  The defendant stated that the Mexican authorities seized several weapons during his arrest, including AK-47s, AR-15s, and handguns, and that the weapons seized included those weapons that were used by the defendant and his *estaca* during the attack on the ICE agents.

i)      The defendant stated that the purpose in stopping the armored vehicle was to steal it.  The defendant explained that neither before nor during the attack, he knew the occupants of the vehicle were American citizens or U.S. federal agents.  Additionally, the defendant stated that no time before, during, or after the attack did the agents show any aggression towards the *estaca* members.

19.     This factual proffer is a summary of the defendant's actions and statements, and is not intended to be a complete accounting of all facts and events related to the offense charged in this case.  The limited purpose of this statement of facts is to demonstrate that a factual basis exists to support the defendant's guilty plea to the offenses of Murder of an Officer or Employee of the United States, as charged in Count One of the Indictment in this case, and Attempted Murder of an Officer or Employee of the United States as charged in Count Two of the Indictment in this case.

Respectfully submitted,


RONALD C. MACHEN JR.
United States Attorney for the
District of Columbia


Michael C. DiLorenzo
(MD Bar No. 931214 0189)
Fernando Campoamor-Sanchez
(DC Bar No.451210)
U.S. Attorney's Office
555 4th Street, NW,  Room
Washington, DC 20530
(202) 252-7809
michael.dilorenzo@usdoj.gov
(202) 252-7924
fernando.campoamor-sanchez@usdoj.gov


JAMES M. TRUSTY
Chief, Organized Crime and Gang Section
U.S. Department of Justice – Criminal Division


David N. Karpel
(CO Bar No. 17865)
Andrea Goldbarg
(NY Bar)
Criminal Division
U.S. Department of Justice
1301 New York Avenue, N.W.
Washington, D.C.  20005
(202) 307-5715
david.karpel@usdoj.gov

145 N Street, N.E.
Two Constitution Square
East Wing, Second Floor
Washington, D.C. 20530
(202) 616-2200
andrea.goldbarg@usdoj.gov


11

## DEFENDANT'S ACKNOWLEDGMENT

I have read this factual proffer and have discussed it with my attorney, Ron Earnest, Esquire. I fully understand this factual proffer. I agree and acknowledge by my signature that this proffer of facts is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this factual proffer fully.

Date: _5/23/13_                          _____

Julian Zapata Espinoza
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this factual proffer, and have reviewed it with my client fully. I concur in my client's desire to adopt this factual proffer as true and accurate. To my knowledge, my client's decision to agree to and adopt this factual proffer is an informed and voluntary one.

Date: _5/23 / 2013_                      _____

Ron Earnest, Esquire
Counsel for the Defendant